May it please the Court, Sven Brand Erickson with Heller & Ehrman here in Seattle for the The appeal, this appeal, involves the standing of the appellant conservation groups to sue the State Department and National Marine Fisheries Service for their actions that are causing the over-harvest of threatened Chinook salmon from Puget Sound and the Columbia River Basin. More specifically, the case involves the elements of standing of causation and redressability. Can you help me just to start out, what are the specific causes of action you're relying on? That is to say, what are the specific provisions of statute or treaty law that you say give you a cause of action? We have three claims, all based on the Endangered Species Act. Section 7 of the Endangered Species Act contains a procedural obligation, a substantive obligation, and an obligation to reinitiate consultation based on new information. So our first claim is that the procedural process followed does not comply with the requirements of Section 7. Our second claim... The first one is consultation required by the Endangered Species Act. Right. The second is that the State Department and NMFSA's acting agencies have a substantive obligation imposed by Section 7. And the third is... And the nature of that substantive obligation is? To avoid jeopardy to listed species. Independent of the consultation argument? Yes. That if you look at Defenders of Wildlife, for example, a portion that was not overturned by the Supreme Court, recognized, and other cases have recognized, that the consultation process is in aid of the substantive obligation of action agencies to act in such a way as to avoid jeopardy to listed species. Okay. And then the third is basically, in the consultation process, there's a requirement to reinitiate consultation if there's new information, which indicates there are four factors that can cause reinitiation of consultation. Okay. But you mentioned that in your first, but you're now splitting that out as a group? The first cause of action is errors in the initial biological opinion, legal deficiencies in the initial biological opinion. The third is new things that develop since the biological opinion was issued that should have caused reinitiation of consultation. Let me ask then another question as to the scope of your claims, because it seemed to me there had been some migration, if you will, of your argument between the time of the district court and now. And looking at your complaint and the argument below, it was focused, it seemed to be, on what the Canadian, you know, in effect, Canadian overfishing is, to be simplistic, as opposed to conduct in the United States. Would you point me to where in the complaint your arguments relate to, not to Canadian fishing, but to U.S. fishing? Let me explain that, and this is really a key distinction in the reason why we have standing. There's a difference between the reason why the biological opinion is flawed and why it should be redone and why consultation should have been reinitiated, and the potential outcomes of a new biological opinion. Under the ESA, when jeopardy is found as a result of agency action, the agencies are obligated to come up with reasonable and prudent alternatives, and the alternatives have to be things that are within the jurisdiction of the agencies to do. Here we have agencies that are participating in a treaty process with Canada that is basically an allocation process. The Pacific Salmon Treaty creates a commission. The commission each year determines how many salmon can be killed on the coast as a whole, between the United States and Canada, and allocates that catch between Canada and the United States. Then there is a process by which that allocation proposed by the commission has to go back to the parties, the United States and Canada, for approval, and the State Department is the approving agency, and that's clearly spelled out in the Pacific Salmon Treaty Act. And what they are approving is both the U.S. allocation and objecting or failing to object to the Canadian allocation. So that, in essence, those are the actions that are covered by this biological opinion. But in effect, that's a renegotiation, if it's instituted, correct, of the treaty? It's implementation of the treaty on an annual basis, determination of how much catch is going to occur on an annual basis. And our point is that the fish are caught, it's the same fish that are being pursued by the Canadians in the United States. That's why we have a treaty. It is up to these federal agencies to decide whether or not the collective catch is excessive. Our point is that the Canadians, the harvest, particularly of Puget Sound Chinook and Lower Columbia Chinook, but also Snake River Chinook, is really centered in Canada. There's almost none caught in Alaska. There are quite a few caught off the coast of Washington, Oregon, and then in Puget Sound in the Columbia Basin. If the correct analysis is applied, the Canadian harvest combined with the U.S. harvest is too much for these species to recover. But just to go back, the target is the Canadian fishing. Yes. But your argument is that it's intertwined with the United States conduct and consultation. What do the agencies do in response to the Canadian fishing? If they conclude, as they have here, that the level of harvest occurring in Canada is not sufficient to jeopardize the species, then that does not require them to make any changes in the U.S. fishing. If, as we believe, the Canadian harvest is excessive, and is in fact, when combined with the U.S. harvest, jeopardizing the species, then these agencies would be faced with a choice. They would have to either exercise their authority under the treaty, as they recognize in the biological opinion, to ask the Canadians to make conservation changes in their fisheries, or impose those changes in the United States. With either of those two alternatives, seeking reduction of the Canadian take, or reducing the American take, does that require renegotiation of the entire treaty? Or does that merely require negotiation with respect to the annual take, with the existing treaties remaining in place? It does not require renegotiation of the treaty. As to the Canadians, it would require participation in the existing treaty process. As to the United States, it would be outside of the treaty. You're telling us that there are mechanisms in the existing treaty for the United States and the Canadians to talk year by year, as to what the take level is for any particular year. That's right. If you look at Article 4 of the treaty, it lays out an annual process of information being provided to the panels. The panels develop recommendations, recommendations go to the commission, the commission sends the recommendations, makes it in essence an allocation, proposes it to the parties, the United States and Canada. The United States and Canada agree to that allocation. The State Department then tells the states and the tribes, this is the allocation for this year, go out and implement your individual fisheries. Then there's a process to allocate. North of the Falcon Peninsula in Oregon, there's the North of Falcon process that allocates the fisheries on the coast of Washington, Oregon. There's the allocation of the fisheries south of Falcon to California and Oregon. There's the Columbia River. If you get what you want, which is to say I guess a new biological opinion that in your view, if it's correct, would say several of these listed species are endangered, then I guess what happens if you get what you want is the United States, under the treaty process, goes to Canada and says, we've got a problem of overfishing and we want you to reduce. And the Canadians can say yes or no. That's right. And if they say no, then the State Department has to turn to the U.S. fishing interests and say, we're sorry, but we're bound by the ESA to manage these fisheries in such a way as to avoid jeopardy to the listed fish. We would prefer that the Canadians reduce their fishing, but they're not willing to do so. And we can't just throw our hands up and watch the fish be harvested. Let me ask you about that. Go ahead and finish that. I think it's the question Judge McKeown is about to ask, which is to say, okay, but if that's the alternative that we may end up with, it is to say, okay, the Canadians have said no, and therefore the United States has to reduce its take. Where is that in your complaint? It is clearly in your brief now. That's right. I just can't find it in the complaint or the district court. It's a remedy, isn't it? It is a remedy. Basically, I guess the way that we looked at this in drafting the complaint is that's a reasonable and prudent alternative. That's what happens when the agency, you know, if we were challenging a biological opinion on the Puget Sound fishery, our complaint would be about the biological opinion on the Puget Sound fishery. We were challenging the biological opinion, the evaluation of the Canadian harvest, and so that's why our complaint talks about the Canadian harvest. But it's the outcome of a renewed consultation that really is what you're looking for in our complaint, and it is the remedy. You know, in essence, we believe that the agencies are familiar with the process. But let's go back to the consultation because the Article 4, is that the consultation provision? No, I'm sorry. Article 4 of the treaty is just the process by which fisheries are run. But then there's a part about re-initiation of consultation, which you argue about, correct? There is a provision in the Chinook chapter which acknowledges and recognizes that the parties may propose in the treaty process additional conservation measures to aid individual species or individual runs. Is that one of the things you're seeking is a re-initiation of the consultation? It is. Well, first let's have a simple answer and then you can make it more complicated. Yes or no, are you seeking a re-initiation of consultation? That would be the agency's choice because that would be how they would actually respond to the outcome of an ESA consultation. What you just described, what we were just talking about, is part of the treaty process, not part of the ESA process. Okay, but you also said as your third cause of action a re-initiation. That's re-initiation of consultation on the biological opinion. There are regulations where if new information has come to light, in this case changes in the Canadian fishery that weren't anticipated at the time the treaty was negotiated and some other factors, that new information should cause, and the consultation that I'm talking about is between the State Department and NIPS. It's not with Canada. The ESA consultation process is between the State Department and NIPS. The State Department is an action agency. NIPS also has an action agency role here. Consulting with the specialists at NIPS who implement the ESA as to whether or not there's jeopardy to the species from the role that the agencies are playing. I'm reading your prayer for relief. In Arabic 2, in prayer for relief, enter appropriate injunctive relief to ensure that defendants comply with the Endangered Species Act and the Administrative Procedures Act. And to prevent irreparable harm to the plaintiffs and the environment until such compliance occurs. I guess you're saying that that's broad and whatever is necessary to ensure compliance might include, if the Canadians say no, reducing the American take. What we would expect is if we were successful in the district court in order of directing the agencies to re-initiate consultation, we would not expect the district court to prejudge the outcome of that consultation for what exactly the reasonable and prudent alternatives would be coming out of it. Let me just stop right there because now we're back to what I asked you specifically about the re-initiation of consultation. Is that in the connection with the ESA or is that the treaty? ESA, ESA consultation. I'm sorry, when I say consultation I mean ESA consultation. That's what's been confusing partly in the briefing because the treaty also has a re-initiation related to affirmative conduct. Yes, the production of the biological opinion is the result of a consultation between National Marine Fisheries Service and the State Department. So what we were seeking, what we are seeking in this case is a determination that the biological opinion is legally flawed and that there have been events that have occurred since it was issued that should have caused these agencies to revisit the biological opinion and in order to them to proceed and do that. And the reason that this is not the, that in order to re-initiate ESA consultation is not the equivalent of an order to the State Department to go negotiate with Canada which would be beyond the jurisdiction of the courts is because the agency has the option of looking to U.S. fisheries to correct the problem if they choose to. But the first consequence of re-initiating consultation would be with the Canadians or no? Would be with the U.S.? It would be between the State Department and National Marine Fisheries Service. But, so it would just be an agency to agency consultation? That's right and they'd be evaluating... We would be ordering, if you were successful, the court would order the State Department and National Marine Fisheries to consult? That's right. That's right. We would not be ordering them to go... And the State Department might say, we've consulted and for diplomatic and other reasons, we're done consulting. Assuming they... They would have to produce a new biological opinion. They'd have to look at whether or not fishing is going to have an adverse effect, whether or not in fact the fishing that's occurring is jeopardizing the species. If it is jeopardizing the species, they would have to identify their alternatives. Their alternatives would be at least to talk to Canada, change the U.S. fisheries. It would then be up to the agencies to choose which of those alternatives to pursue. If they were unsuccessful with Canada, they could not just say, well, that's the way life is. We're going to fish these things to extinction. Well, they would have to, if the administrative process supported it, they would have to take one of the alternatives, correct? In fairness, a reasonable attempt to take one of the alternatives. That's right. But it would not just be an alternative that's aimed at Canada. And that's... The point is that while the reason for ESA compliance problems here is the impact of Canadian fishing under this treaty. That's what we focus this complaint on. The alternatives available to the agency, if the flaw we've identified is recognized, is not limited to Canada. And that is why the problems identified by the district court don't exist with our claim. Do I reserve the remaining time? Thank you. May it please the court. I'm Mark Hague from the Department of Justice for the United States. And with me at council table is Michael Shapiro. Michael Bancroft from the NOAA Office of General Counsel. I want to pick up with some of the questions that we were just discussing. Because I think the confusion in this case is because there's a disconnect between the relief that SSRA is asking for and the agency actions that they have actually challenged. And it grows in part out of a misunderstanding of the nature of the treaty and what it does and what it doesn't do. I think the first point to say is that the treaty is an allocation of the harvest between Canada and the U.S. But if the treaty sets the harvest level here, but the Endangered Species Act says that the U.S. harvest has to be lower than Canada, the treaty does not authorize any U.S. agency to exceed those harvest levels in the U.S. So the treaty is not an opportunity for the United States government to say, oh, it's the Canadians' fault, we can't do anything about that. And in fact, in the southern fisheries, the constraint on salmon harvest for many years has not been the treaty limits. It has been other limits adopted through other biological opinions. When you say southern, what do you mean? Washington, Oregon, and California. So Puget Sound, Columbia River, and off the coast of Washington, Oregon. Those fisheries are mentioned in the biological opinion on this treaty, but this biological opinion does not purport to set limits on those fisheries or address jeopardy caused by those fisheries. And in fact, SSRA has another case pending right now where they are challenging a 2004 biological opinion on one of those southern fisheries. And I have just provided a 28-J letter. So going back then, the biological opinion which is challenged here covers some of these southern fisheries as well, or no? Well, the biological opinion that's covered here covers two agency actions. The State Department's decision to enter into the treaty on behalf of the United States, and NIMF's decision to authorize Alaskan fishing at the levels established in the treaty. And SSRA, in its brief, expressly disclaims any intent to challenge the Alaskan fisheries. They challenge the level of the Canadian fisheries, and the BIOP doesn't deal with the southern fisheries. So all that's left in this case is the decision to enter into a treaty with Canada. That decision has been made, and the Alaskan fisheries, which they say they're not challenging. Now, if the biological opinion were revised, and if the revised biological opinion were to say that the current take level combined with the current level, the Canadian fishery and what you call the southern fishery, is in fact jeopardizing some of these endangered species, what would then happen? Probably nothing, Your Honor, but I want to... Why do you say probably nothing? Consultation doesn't happen in a vacuum. Consultation happens in connection with an agency action. And which consultation are you now talking about? Consultation between the American agencies, or are you talking about consultation with the Canadians? Well, I'll use the word negotiation when we're talking about the Canadians. ESA consultation is tied to an agency action in the APA sense of the word. And ESA review happens under the APA. So we need an agency action. The agency action that was the subject of this biological opinion in 1999 was the decision by the State Department to enter into the treaty. Well, whether that decision was right or wrong, whether the biological opinion was right or wrong, that's done. The United States has entered into the treaty. You can't unring that bell. The treaty, in fact, these treaty amendments expire at the end of 2008, and the United States is in the process of negotiating the next one. So reinitiating consultation on whether the United States should enter into this treaty is a moot point. On the 2008 when it runs out, will there be a new biological opinion that would drive what the State Department and NIMS would or wouldn't do? My understanding is that there will be. So going back to SSRA's argument, their argument was if you had a new consultation, that there could be, and it was determined that the species are in continuing jeopardy, but worse jeopardy than before, perhaps. Then you might have two alternatives, one relating to the Canadians and one relating to the Americans. Do you agree that that would be the procedural chronology in effect that would be followed if a question was asked, for example, a district court were to order a reconsultation under Section 7? I suppose so, Your Honor, but the problem is what is it that the court is ordering the agencies to reconsult on? There's no point in reconsulting on the 1999 decision, and to the extent that SSRA wants to get relief aimed at U.S. management of U.S. fisheries, which is the only redress that's really available to them. There have been subsequent biological opinions that set the harvest levels on the southern fishery, and there's the biological opinion addressing Alaska, so they can get their day in court on those matters. But you seem to be describing, the two of you seem to be describing two quite different processes. This process, as you described, is once the United States enters into this treaty with Canada, we're done. But I'm hearing from the other side that that's only the first step, that once you enter into the treaty, that every year the Canadians and the Americans agree on various things with respect to the fishery, including, I think, an overall take level? That is, yes. And at least as I heard the argument, if the biological opinion were found defective, or if it were necessary because of changed conditions to enter into a new biological opinion, at least I'm hearing from the other side, that means that there may be an approach to the Canadians that says, you know what, we're in real trouble with these endangered species, would you please reduce your take? And of course the Canadians are free to say no, but would that in fact happen? That the United States would go to Canada and say, in light of this new information, we have to tell you that some of our species are now endangered in ways that we did not previously realize? The disagreement between us and the SSRA on this point is the way that the treaty works. In 1999, what this biological opinion looked at, the 1999 amendments set up a rubric or a formula for calculating what the overall harvest levels are going to be, based on information that comes in, an algorithm, algorithm is the word I'm looking for. And that was agreed to in 1999, and in every year since, technocrats on the commission and in the government agencies collect the data, plug it into the algorithm, and the result is a number. So there are not agency actions in the APA sense of a final agency decision, that we're making a new decision this year, this is what the harvest levels are going to be. Rather, there's a formula that was agreed to in 1999 that is applied every year, depending on the fluctuations in the size. And what would happen if into this process were injected a new biological opinion that says the formula that you guys are now applying is resulting in increased jeopardy to endangered species? Is the United States empowered to ask Canada? Certainly the United States is empowered to ask. Without renegotiating the treaty? Yes. The United States is empowered to ask under the terms of the treaty. So we don't need to contemplate then a renegotiation of the treaty if a new biological opinion comes out that says what they think it will say. First of all, the judicial branch can't order the executive branch to engage in negotiations. But here you're not talking negotiation of a new treaty, you're talking about negotiations of a take level under an existing treaty. Right, and I think that there would still be that problem. And there's the additional problem that the Canadians can say yes or no. And the executive branch has the prerogative to decide, well, we're not going to press for changes in a treaty that's going to expire in seven months. Instead, we're going to focus our energies on negotiating the next treaty. This is why I think we seem to have two different cases here. Because if I hear you, you're saying, look, the whole premise of the biological opinion was, should we enter into these 1999 treaty amendments, yes or no, and at what level. They're saying, well, we're not trying to undo your treaty, we just want you to go back and redo the biological opinion. But it seems like we're talking almost like about two different biological opinions. So that's why I'm having a little bit of collision between the two sides. If you could explain. I think SSRA's notion of the way that the treaty operates is incorrect. At whatever limit the treaty sets on U.S. fishing, that is not an authorization for NIMFS to allow fishing up to that level, if the ESA says otherwise. There are other agency actions for which biological opinions have been approved, including the one attached to the 28J letter, that look at the effect of various parts of the southern fisheries on these stocks. They're not addressed in the 1999 biological opinion. If SSRA wants to challenge those agencies' decisions, those decisions that set the actual constraints, they can do it. But they can't do it through a challenge to the 1999 biological opinion, because the 1999 biological opinion doesn't address those fisheries. The 1999 biological opinion, in your view, addresses only a portion of the Alaska fishery, and yes or no whether to enter into the treaty amendments? It addresses the effect of the Alaska, two things. The decision to enter into the treaty, and whether entering into the treaty is consistent with the ESA. And NIMFS, to give it a little more detail, NIMFS decision to defer management of the Alaskan fisheries to the state of Alaska, which in turn agrees to manage according to the treaty limits. The Alaska fishery is off the table in this case, because SSRA says they're not challenging it. And the 1999 biop acknowledges that the southern fisheries are out there, but says they will be addressed in different biological opinions. And since 1999, they have been addressed in different biological opinions. So which fisheries are addressed with respect to whether to enter into the treaty in the 1999 biological opinion? The Canadian fisheries and the Alaskan fisheries. So the 1999 biological opinion does not address U.S. fisheries in terms of the Endangered Species Act? The 1999 biological opinion says that the decision to enter into the treaty is consistent with the Endangered Species Act. And part of that analysis was the determination that the Canadian harvest would be lower if the United States entered into the treaty amendments than if it didn't. So it's better. Now, the district court, of course, decided this based on lack of Article III standing. And the rationale the district court had was, well, even if you get a new biological opinion that comports with what you think it should say, nonetheless it's entirely speculative whether you're going to get any relief you want, because some new negotiation will be required with the Canadians, and the Canadians can say no, or the United States government can decide not to negotiate. And if it decides to negotiate, the Canadian government can say no. I have trouble with that chain of reasoning as to Article III, because as I look at other areas of the law and standing, you don't require a particular result. For example, under NEPA, NEPA requires that the federal government study things. And once they've studied, they can do anything they want. So I may want them not to cut down whatever it is. I may want them to preserve the body of water in the form that it exists. And that's my ultimate aim, just as their ultimate aim is to reduce the take. But I get a NEPA study with absolutely no guarantee that I will ever get what I want. Another argument out of standing is, you're probably aware of these, there's a whole line of cases where disappointed applicants for positions, either admissions to schools or getting contracts, are allowed to challenge affirmative action programs, even though it is conceded that in the absence of the program, they wouldn't get the contract. So why is the fact that the ultimate relief they want, which is to say reduce take, is speculative? Why is that a failure of Article III standing, given these other well-established cases? There are two standing problems here. There's the redressability, the speculative nature of redress, and also causation. I understand that. But speculative nature of ultimate relief, given these other cases, doesn't matter much. They have a right, they say, to the consultation. And whatever happens after the consultation, well, we'll find out. But what they say they have a right to is the consultation. The oral argument was they have a procedural claim and a substantive claim. I think if you look at their complaint, they acknowledge that there was a consultation on the treaty. What they say is the substantive result of it was wrong. This is not a procedural standing case. These are substantive challenges to the merits of the biological opinion. Number two is the APA agency action component of this. The redress in an APA case is to vacate and remand to the agency. You did it wrong, you vacate and send it back, do it over again and do it right. But here, the agency action is completed. The decision to enter into the treaty is done. Well, what about their argument that there's a continuing obligation to do a new biop? Now, you may say there is no such continuing obligation. That's an argument on the merits as to whether there's an obligation. That doesn't sound to me like a standing argument. Well, I think the California sport fishing case and the Mateo cases that we cite in our briefs, both address this as a standing issue. There's no duty to reconsult on an action that's completed. And the mere fact that an agency has discretion to go back and revisit, to go back to the person who has the license to operate the dam, doesn't mean that the agency requires it. And you're saying you have no duty to reconsult, which may or may not be true. But the district court didn't address that question. That's right. But the difficulty here, we haven't briefed this as a failure to state a claim, because we're not there yet. But if one starts to refocus SSRA's claim, when you look at SSRA's claims, they're complaining about Canadian fishing. They're complaining about Canadian fishing in the sense that their ultimate aim is they want that fishing reduced. But their legal claim is not Canadian fishing. Their legal claim is failure properly to consult or failure to reinitiate consultation that they claim is required under the statute. Isn't that a procedural injury claim? Well, it's not a procedural claim to say that the State Department and NIMS failed to consult, because we're evaluating a biological opinion. The biological opinion is done. They don't say that there was any error in the procedure by which the biological opinion was done. Isn't that a procedural injury? That would be a procedural injury. And the problem with that is the agency action on which they are seeking reinitiation of consultation is complete. It's over. And that's the treaty. That's the decision to enter into the treaty. If the agency action is complete and over, they, in effect, say, well, we don't really want to unring the bell. We'd just like to, within the context of the treaty, reinitiate consultation under Section 7. Would not the 1999 biop be susceptible to that kind of reinitiation or no? I don't think it is, Your Honor, because I don't think, not with respect to the levels of Canadian harvest. It is an ongoing action with respect to its impact on the Alaskan fisheries. Right. What about this recognition, though, in the opinion itself, that the agreement, I mean, the treaty, I think, can be reopened. Doesn't the biop recognize that? Yes. And so, in that sense, reinitiating the consultation is not futile, is it? If the treaty is subject to reopening, not that they can enforce, require the secretary to do that, but, I mean, there is that possibility, making it not futile. There is the possibility. But, I mean, I guess what's baffling about this case is that it's the extent to which, I mean, I think SSRA is barking up the wrong tree. I don't understand why we're arguing about the authority to require the Canadians to do something when they can get relief in the context of U.S. management of U.S. fisheries. And to go back and re-do this, re-look at the analysis of the decision to enter into a treaty that's going to expire in seven months just seems to be a pointless exercise in addition to... Have you tried mediation on this point? I mean, it is sort of, you know, it's a complicated standing issue. It's going to take us some time to sort through. If the SRA were successful, it would go back to the district court and then it would go through the proceedings and that probably would take you beyond the expiration of the treaty, correct? Is it self-regenerating or does it need to actually be renegotiated? I believe that the parties can agree to continue to follow the process But it takes some affirmative action on the part of the parties to do that. Nobody is... I believe once it expires, it expires and no one is bound by it anymore. I think the hope is that if there isn't a new agreement in place that they... And will the extension of it, if that's the right word, will that be agency action requiring consultation? I don't know your answer. Whether you need a new biological opinion, for example. I don't know the answer to that. So this may not move out just because it sounds like it's ending but maybe it's not. That's right, but the fact that it doesn't move out doesn't change the problem with, you know, they're not challenging the Alaskan fishery, they're focusing on the Canadian fishery and the Canadian fishery is managed by the Canadians. You have about two and a half minutes. Thank you, Your Honor. Your Honor, I want to touch on several points. Whether or not this was a one-time action or a continuing action, there was a one-time agreement to a treaty. The treaty set terms for management of the fisheries and there's ongoing management of the fisheries. For litigation purposes, the government's position has been that that decision to enter into the treaty was a one-time event that can never be revisited. If you look at the biological opinion itself and the portions quoted in our brief, it is very clear that National Marine Fisheries Service believed it would have to revisit the implementation of the fisheries and in fact would have to propose conservation measures. They said it was reasonable to expect that during the course of the implementation of this treaty, conservation measures would have to be proposed in the context of the implementation of the treaty to protect particular populations. So it is simply false that the government believed when they entered into the treaty that it was a one-time event that would be done forever. Western Watershed's case, which Judge McCune was on the panel for, was a case involving BLM right-of-ways that had been granted by statute 100 years ago and there had been no action to reopen those right-of-ways. This is substantially different here. National Marine Fisheries Service and the State Department believed that they had the ability to influence the implementation of this treaty and they said so in the biological opinion. They also participate every year in the process of implementing the allocation between the United States. Let me ask you as a practical matter if the treaty is expiring in seven to eight months and if you are successful you would have to go back to the district court and then argue on the merits as to whether you have a claim or not and let's assume you had a claim which ultimately ordered reinitiation of consultation. All of that would be eclipsed by the expiration of the treaty, wouldn't it? Last time it took them five years after the expiration of the treaty to adopt a new treaty. So the terms of this treaty may in fact remain in effect for a long time. That would have to be by agreement though if it expires, correct? I'm not sure if it would be by agreement or not. Whatever the terms of the treaty say. Would you need a new biological opinion in order to extend it? I think the agencies would say we're just relying on the biological opinion we did before. We evaluated this treaty. We're continuing to comply by its terms. Therefore there's no new thing for us to evaluate. We've already evaluated the terms. If you determine we don't have standing then we're not going to have standing to challenge the renewed biological opinion either. So the standing question is very important not just for this treaty but for the renewal of the treaty and for the consensus. Why wouldn't you? For example at the outset as a procedural matter in an interested party you would have had the authority to challenge the 1999 biological opinion, would you not? We did challenge the 1999 biological opinion and their position would be that the day after it was issued and the day after the State Department agreed to the treaty. So it's not fair to say that you wouldn't have standing to challenge a new biological opinion in connection with a treaty amendment or extension? If there were a new biological opinion, if they had to issue one. Thank you. We appreciate the arguments from both counsel. It's a complicated and interesting case. The case of the Salmon Spawning and Recovery Alliance versus Gutierrez is submitted. And our next case for argument this morning is Brandenburg versus Bull.
judges: Tashima, McKeown, Fletcher